# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### March 5, 2013 Session

## STATE OF TENNESSEE v. DEXTER COX

**Appeal from the Criminal Court for Shelby County**
**No. 08-06537    Chris Craft, Judge**

---

**No. W2012-00886-CCA-R3-CD  - Filed September 30, 2013**

---

A Shelby County grand jury indicted Appellant, Dexter Cox, for first degree premeditated murder in September of 2008. After a jury trial, Appellant was found guilty of first degree murder, for which the trial court sentenced Appellant to life without the possibility of parole. The sentence was ordered to be served consecutively to a previously imposed life sentence. Appellant challenges his conviction, claiming that his confession was the product of an illegal arrest and was involuntary. Following our review, we affirm the judgmens of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.**

JERRY L. SMITH, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and ROGER A. PAGE, J., joined.

Claiborne H. Ferguson, Memphis, Tennessee, for the appellant, Dexter Cox.

Robert E. Cooper, Jr., Attorney General and Reporter; Rachel E. Willis, Assistant Attorney General; Amy P. Weirich, District Attorney General, and Dean Decandia, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Factual Background

Appellant was charged in separate indictments for his involvement in the unrelated murders of three individuals, including the victim in this case, Gwendolyn Cherry. He was also charged with the murder of Memphis police officer Lieutenant Ed Vidulich and a third person, Herbert Wooten. *See State v. Dexter Cox*, No. W2011-01429-CCA-R3-CD, 2013 WL 118714, at *1 (Tenn. Crim. App., at Jackson, Jan. 9, 2013), *perm. app. denied*, (Tenn.

June 19, 2013) ("*Dexter Cox I*").  Appellant was developed first as a suspect in the Vidulich murder, which led to the discovery of his involvement in the murders of Wooten and Cherry. Prior to trial, Appellant filed a motion to suppress his confession to the murder of Gwendolyn Cherry.[1]

*Facts from Hearing on Motion to Suppress*

The facts from the hearing on the motion to suppress are taken from Appellant's appeal from the conviction for the Wooten murder and are as follows:

> Sergeant William Merritt testified that he was a homicide investigator with the Memphis Police Department.  He was the lead investigator in the present case as well as the case involving Ms. Cherry, who had been murdered in December 2007.  Both homicides occurred in the Frayser area of Memphis, and a .40 caliber handgun was the murder weapon in both cases.  Forensic testing from the Tennessee Bureau of Investigation ("TBI") confirmed that the same firearm was used in both murders.  Until January 2008, Sergeant Merritt had not developed a suspect in the murders.

> In the early morning hours of January 28, 2008, Sergeant Merritt received a call from his supervisor to respond to the home of Lieutenant Vidulich, who had been shot to death at his home.  Sergeant Merritt became the lead investigator in that case as well.  Lieutenant Vidulich lived on Shiloh Street, also in the Frayser area of Memphis.  Sergeant Merritt learned that police discovered Lieutenant Vidulich's personal vehicle in flames on another street in the neighborhood.  Officers checked the vehicle's registration, which led police to the murdered officer's home.

> At Lieutenant Vidulich's home, Sergeant Merritt discovered three empty gun boxes inside a bedroom closet.  He then learned that in July 2007, Lieutenant Vidulich had filed a police report indicating that his home had been burglarized while he was out of town.  A few days prior to his death, Lieutenant Vidulich supplied the police with supplemental information about a potential suspect in the burglary.  He contacted Officer Patrick [FN1], who took the original report in 2007, and told Officer Patrick that an individual who identified himself as "Tony Smith" claimed to have information regarding the

---

[1] The trial court considered the motion to suppress in a consolidated hearing with the two other murder charges being faced by Appellant.  In at least one other case, Appellant has appealed the denial of the motion to suppress, raising similar, if not identical issues to those raised herein.  *See Dexter Cox I*, 2013 WL 118714, at *1.

burglary. When Officer Patrick arrived at Lieutenant Vidulich's home to obtain the supplemental information, "Tony Smith" was present and was interviewed by Officer Patrick. "Tony Smith" indicated that he worked at Colton's Steakhouse, that he lived on Haywood Avenue, and that he was a student at Frayser High School. He also gave the officers a cellular telephone number where he could be reached.

> FN1. Several officers are referenced by last name only. Those officers did not testify; thus, their first names are unknown.

During the investigation of Lieutenant Vidulich's murder, Sergeant Merritt asked Sergeant Eddie Bass [FN2] to research "Tony Smith" so that officers could question him further. Sergeant Bass canvassed the neighborhood where "Tony Smith" supposedly lived. He also visited Frayser High School on January 31, 2008, where he learned that an individual named Dexter Cox (hereinafter "[A]ppellant") had been arrested the previous day for possession of a weapon and firing a weapon across the street from the school. Based on this information, Sergeant Merritt retrieved the information on [A]ppellant's arrest and learned the circumstances of the arrest. After learning the serial number, make, and model of the weapon involved in [A]ppellant's arrest, Sergeant Merritt contacted Sergeant Collins and asked him to check the serial numbers on the empty gun boxes located in Lieutenant Vidulich's home. The serial number on a box that had contained a SIG Sauer 9 millimeter handgun matched the serial number listed on [A]ppellant's arrest warrant as the weapon he illegally possessed and fired.

> FN2. Sergeant Bass has since been promoted to the rank of lieutenant.

While at Frayser High School, Sergeant Bass telephoned the number that "Tony Smith" had given to Officer Patrick and learned that the number belonged to [A]ppellant's mother. Sergeant Bass asked Officer Patrick to meet him at Frayser High School, where Officer Patrick viewed a photograph of appellant and identified him as "Tony Smith." Sergeant Merritt learned that the street address "Tony Smith" had provided to Officer Patrick during the interview was fictitious, but [A]ppellant had provided officers with a legitimate home address on Haywood Avenue when he was arrested the previous day.

Based upon the new information that [A]ppellant and "Tony Smith" were the same individual, the officers attempted to locate [A]ppellant. They learned that he was due to appear in general sessions court on the weapons charge that day, January 31st. [FN3] Sergeant Merritt, Lieutenant Mark Miller, and other officers went to general sessions court and located [A]ppellant standing in a hall near the courtroom. They escorted [A]ppellant upstairs to the homicide bureau and placed him in a large interview room at approximately 10:15 or 10:20 a.m. Appellant was calm and cooperative and did not appear to be intoxicated. He did not invoke his right to remain silent or demand a lawyer. After reading appellant his rights, Chief Toney Armstrong [FN4] and Lieutenant Barry Hanks conducted the interview of [A]ppellant while Sergeant Merritt continued with other aspects of the investigation.

> FN3. During oral arguments before this court on August 7, 2012, the parties agreed that [A]ppellant had been released on bond following his arrest on January 30, 2008.

> FN4. Between the date of the hearing on [A]ppellant's motion to suppress and the date of his trial, Chief Armstrong was promoted to Director of the Memphis Police Department. For consistency, we refer to him as Chief Armstrong throughout the opinion rather than Chief at the suppression hearing and Director at the trial.

Sergeant Merritt learned that on the previous day, [A]ppellant had been arrested at the home of Dondriel Cunningham at 1515 Dalewood Avenue. Around the same time officers were interviewing [A]ppellant, Sergeant Merritt and Sergeant Quinn interviewed Mr. Cunningham. Mr. Cunningham told the officers that [A]ppellant visited his home and offered to sell him the 9 millimeter SIG Sauer. Mr. Cunningham informed [A]ppellant that he was not interested in purchasing a weapon at that time. Mr. Cunningham and [A]ppellant then went to [A]ppellant's home, where [A]ppellant showed him three other weapons he had for sale, including two .40 caliber semiautomatic handguns and a. 38 caliber revolver. The other weapons were concealed in an orange newspaper bag and further hidden inside a vent in the wall. Mr. Cunningham again informed [A]ppellant that he was not interested in purchasing a weapon. Appellant replaced the weapons where they were hidden, and Mr. Cunningham and [A]ppellant then returned to Mr. Cunningham's residence. At Mr. Cunningham's residence, they went into the

-4-

back yard, and [A]ppellant fired a shot into the air with the 9 millimeter SIG Sauer. A few moments later, a police officer from Frayser High School arrived, arrested [A]ppellant, and took him into custody.

By the time Sergeants Merritt and Quinn finished interviewing Mr. Cunningham, Chief Armstrong and Lieutenant Hanks had completed an interview with [A]ppellant but did not have a formal statement from him yet. [FN5] Sergeant Merritt learned that [A]ppellant's rendition of the facts was in conflict with Mr. Cunningham's statement. Appellant claimed that he and Mr. Cunningham found the weapon while walking through a "cut," and one of them kicked a bag that contained the gun.

> FN5. The record reflects that [A]ppellant gave three formal statements: (1) a written statement regarding his involvement in the burglary of Lieutenant Vidulich's home and theft of property; (2) a written statement confessing to the murder of Lieutenant Vidulich; and (3) a tape-recorded statement confessing to the murder of Herbert Wooten.

A few hours later, Sergeant Merritt and Lieutenant Bass spoke with [A]ppellant. Although Sergeant Merritt did not think it was necessary to execute a second rights waiver form, he nonetheless advised [A]ppellant of his rights again orally and in writing. Appellant did not invoke his right to remain silent or demand an attorney. He did not express any threats or promises made by other police officers earlier that day or complain of any coercion. Appellant gave his first written statement and described the version of the events as he first told officers earlier in the day. Sergeant Merritt confronted [A]ppellant with the fact that the 9 millimeter handgun he possessed and fired had been taken from Lieutenant Vidulich's home, but Appellant maintained the story about finding the gun in a "cut." Sergeant Merritt explained to [A]ppellant that he would be taken into custody on potential charges of theft of property and aggravated burglary. Appellant informed Sergeant Merritt that he was tired and wanted to get some sleep. Around 10:30 p.m., he requested to be booked into jail so he could rest. On the way to the intake area, [A]ppellant asked what the charges were. Sergeant Merritt explained that he was not charged with anything at that time but that he was being booked on a "48–hour hold for aggravated burglary and theft of property." Appellant asked where he was going to serve his sentence and asked if Sergeant Merritt thought he might be charged with voluntary manslaughter. In response, Sergeant Merritt told [A]ppellant, "[I]f there's some stuff you want to talk about now about

Lieutenant Vidulich's death [,] we can go back up there and we can go on and get all of this out." Appellant told him, "[N]o . . . let me sleep. I want to get some sleep . . . in the morning, I'll tell y'all the truth. I'll tell you everything that happened."

On the morning of February 1, 2008, Sergeant Merritt again interviewed [A]ppellant at the homicide bureau. He advised [A]ppellant of his rights in printed form. Appellant changed aspects of his first statement concerning the burglary and theft of Lieutenant Vidulich's gun, which caused officers to temporarily pause the interview so they could obtain statements from various witnesses he mentioned, including potential alibi witnesses. Officers gave [A]ppellant a snack, a drink, and a restroom break. He took a two- to three-hour nap during that time. Later that evening, Detective Paul Sherman arrived and began an interview with [A]ppellant that resulted in [A]ppellant's second written statement. Chief Armstrong joined them. Sergeant Merritt began observing the interview via closed circuit television around 9:30 p.m. He did not observe [A]ppellant ask for an attorney, invoke his right to remain silent, or hear any promises or threats against [A]ppellant.

On February 21, 2008, Sergeant Merritt met with Barbara Wooten, widow of Herbert Wooten, the victim in this case. He showed Mrs. Wooten a photograph array from which she positively identified [A]ppellant as her husband's killer.

On cross-examination, Sergeant Merritt acknowledged that officers believed that Lieutenant Vidulich's guns had been stolen because the boxes that would have contained them were empty. He did not check Lieutenant Vidulich's residence in Florida or check with his wife to determine if the firearms were located elsewhere. Sergeant Merritt explained the concept of a "48–hour hold," stating, "It's a form that we fill out that's reviewed by a judicial commissioner that allows us to detain a person if there's probable cause to do so to continue an investigation." He further explained that the requirement was relatively new, having been in effect for a only a few years. Previously, officers could hold someone for seventy-two hours without appearing before a magistrate. Sergeant Merritt clarified that with regard to the Vidulich case, [A]ppellant gave a written statement to him and Sergeant Bass on the first day and a second written statement to Chief Armstrong and Detective Sherman on the second day. He also gave a third statement, the tape-recorded statement regarding the Wooten and Cherry cases.

Chief Toney Armstrong, deputy chief over Division One Uniform Patrol, testified that he was assigned to the homicide division in 2008 and was involved in the investigation involving the death of Lieutenant Vidulich. After [A]ppellant was taken into custody outside of general sessions court, Chief Armstrong advised [A]ppellant of his rights. They interviewed [A]ppellant regarding how he came into possession of the pistol that belonged to Lieutenant Vidulich. Appellant stated that he and a friend had found the weapon in a bag while they were walking through a field. Chief Armstrong also asked [A]ppellant about Lieutenant Vidulich's vehicle, and [A]ppellant indicated that he had seen the vehicle burning. Appellant never indicated that he wanted a lawyer or wanted to invoke his right to remain silent. Chief Armstrong did not threaten, coerce, or make any promises to induce [A]ppellant to give the statements.

On February 1, 2008, Chief Armstrong watched an interview, via closed circuit television, of [A]ppellant conducted by Detective Sherman in which appellant admitted to killing Lieutenant Vidulich. Chief Armstrong entered the room at the conclusion of the interview and informed [A]ppellant that they needed to take a formal statement at that point. Appellant initialed all ten pages of the resulting type-written statement and signed it.

At the conclusion of the interview during which [A]ppellant confessed, Chief Armstrong made him aware that he was suspected in two other murder investigations because they had ballistics reports matching the murder weapon in Lieutenant Vidulich's case with two other murder victims. Because of the late hour, Chief Armstrong taped the next interview and had the tape transcribed, rather than conducting a formal question-answer type-written interview. The subsequent interview, which resulted in [A]ppellant's third statement to law enforcement, began at approximately 12:30 a.m. on February 2, 2008. Appellant never indicated that he was tired or wanted to cease the interview. He remained cooperative the entire time.

On cross-examination, Chief Armstrong recalled that after [A]ppellant confessed to killing Lieutenant Vidulich, he became very emotional and started crying. Appellant told Chief Armstrong "that he was pretty much relieved because he felt that he was dangerous." Appellant said "that he felt powerful with a gun in his hand. . . . He couldn't explain the feeling that he [got] when [he killed] somebody and that he really needed some help." At the end of the question-answer transcribed interview, Chief Armstrong asked [A]ppellant if he gave the statement freely and voluntarily without any threats, promises, or

coercion. Appellant answered that "an officer told me that if I tell the truth [,] he would help me get a lighter charge than constantly lying." Chief Armstrong acknowledged that the ballistics report from the TBI was available prior to the interview during which [A]ppellant confessed to killing Lieutenant Vidulich, but they did not inform him of the ballistics match until he had confessed. The Vidulich interview ended at 11:50 p.m., and the Wooten/Cherry interview began at 12:30 a.m.

Appellant testified that he first told Sergeant Merritt that he and Mr. Cunningham found the weapon in a "cut" but that Sergeant Merritt "forced" him to "come up with another story because [their] statement[s] didn't match up." He then said he was alone when he found the gun. He testified that Sergeant Merritt and Chief Armstrong tried to persuade him to confess to the murder of Lieutenant Vidulich during the first day of questioning, but he told them he was tired and wanted to go to sleep. He denied having a conversation with Sergeant Merritt about wanting to give a statement the next day or about voluntary manslaughter.

Appellant estimated that he was brought upstairs to the homicide bureau on February 1, 2008, between 9:00 a.m. and 10:00 a.m. He claimed that because he did not immediately confess to the Vidulich murder, Chief Armstrong and Detective Sherman took his family into custody. He said officers threatened to "lock up" his mother and stepfather and send his siblings to child services. He said officers handcuffed his parents. Appellant testified that officers tried to get him to say that his stepfather was in possession of weapons and threatened to arrest his stepfather for being a felon in possession of a firearm if [A]ppellant did not confess. He said that officers eventually arrested his stepfather, charged him with two counts of being a felon in possession of a firearm, and sent him to a federal facility. He also said his mother was handcuffed, and officers threatened to arrest her for allowing prohibited firearms in her home. Appellant said he was told that his parents would be released if he confessed.

Appellant explained that when he was alone with Detective Sherman, Detective Sherman told him that the 48-hour hold was about to expire and that if he confessed to the Vidulich murder, Detective Sherman would charge him with a lesser-included offense of murder. He said that he confessed to secure the release of his parents and to insure he would be charged with a lesser offense.

-8-

On cross-examination, [A]ppellant explained that Sergeant Merritt "forced" him to change his story by telling him that the statements did not match up and that he needed to tell the truth. He claimed that Sergeant Merritt "was throwing the death penalty in [his] face" because an officer had been murdered, and [A]ppellant was in possession of the officer's handgun. He further stated that on the first night of questioning when he told Sergeant Merritt that he did not want to talk anymore, he meant he did not ever want to talk to them again. He said he did not tell officers he wanted to talk to them the following day, and they just retrieved him from downstairs the next morning. He acknowledged that he nonetheless signed waiver of rights forms the following day.

The State called Sergeant Merritt on rebuttal. He confirmed that during [A]ppellant's first statement, he mentioned his mother, stepfather, and brother as alibi witnesses, and Sergeant Merritt wanted to speak with them. Sergeant Collins had already been dispatched to secure [A]ppellant's residence because they had learned that three handguns were hidden there. Officers were in the process of obtaining consent to search but decided that a search warrant would be more appropriate. In the meantime, [A]ppellant's family members were escorted to the homicide bureau, but they came voluntarily. They were not handcuffed. All three family members spoke to Sergeant Merritt willingly and gave statements. The family members then left. Sergeant Merritt confirmed that they were free to leave the entire time.

Sergeant Merritt recalled that the formal Vidulich statement, [A]ppellant's second statement, began around 10:30 p.m. He thought that [A]ppellant's third statement, the result of the Wooten/Cherry tape-recorded interview, ended between 12:30 and 12:50 a.m. During the tape-recorded interview, [A]ppellant told officers that he threw the guns in the Mississippi River but later indicated that the weapons were located in a residence on Haywood Avenue, not far from [A]ppellant's home. Appellant said that he and his stepfather moved the guns. Eric Williams, [A]ppellant's stepfather, was arrested later that morning at M & M Bail Bond Company for public intoxication and driving on a suspended license. He was subsequently charged with two counts of being a convicted felon in possession of a handgun.

The trial court denied [A]ppellant's motion to suppress, finding that [A]ppellant's statements were freely and voluntarily made and were constitutionally obtained.

*Dexter Cox I*, 2013 WL 118714, at *1-6.

*Facts from Trial*

This case involves the murder of Gwendolyn Cherry on October 9, 2007. Officer Roger Barbey responded to a call of "shots fired man down" at 3345 Riney Street. Upon arrival, the victim was found lying in the carport. She was bleeding and unresponsive. There were bullet holes in a car near the victim as well as in the brick wall behind the victim.

According to the medical examiner, Ms. Cherry died of multiple gunshot wounds. She sustained three gunshot wounds to the torso, one to the right forearm, and a graze wound to the back of the left upper arm. At least two of the wounds caused fatal injuries.

When crime scene investigator Demar Wells arrived at the scene, he took note of several bullet fragments in the area around the victim as well as a bullet hole in a car parked near the victim. In all, Investigator Wells collected eleven bullet fragments and two spent projectiles from the scene. Investigator Roger Wheeler assisted in processing the scene of the crime. Investigator Wheeler prepared the crime scene sketch, documenting several "bullet strikes" on the brick wall of the house located behind the victim. He collected two shell casings and one spent round.

Officer Joe Giannini examined the car in the carport at the scene of the crime. There were two bullet strikes and two bullet holes on the car. Three bullet fragments were taken from the area in and around the car. A DNA sample was also taken from the hood of the car.

Three months later, in January of 2008, Appellant went to the home of Dondriel Cunningham. Appellant was "beating on [the] door and ringing the doorbell" and "had a gun for sale." Mr. Cunningham accompanied Appellant to his house where Appellant got out several guns, including "a 9 . . . two 40's, a 38 and a sawed-off shotgun" from an air conditioning vent in the bathroom. The guns were inside an "orange newspaper bag." Mr. Cunningham contracted with Appellant to buy the 9 mm weapon for $150. Mr. Cunningham only had $100 on his person, so Appellant accompanied him back to his house to get the rest of the money. When the two arrived at Mr. Cunningham's house, Appellant decided to test fire the weapon. He fired it into the air twice. An officer at nearby Frayser High School heard the shots, came across the street, and confiscated the weapon. Appellant was arrested. Mr. Cunningham cooperated with authorities by both giving a statement and identifying Appellant in a photographic lineup.

The bullet fragments from the scene were eventually sent to the TBI for ballistic testing. Due to evidence discovered during investigation of the three murders, the firearm

-10-

confiscated by the officer at Appellant's arrest was taken to the crime lab for comparison with the bullet fragments from the Cherry murder.

A search warrant was executed for Appellant's residence. No guns were found in the air conditioning vents. However, police recovered an orange plastic bag from the master bathroom sink.

During an interview conducted by Detective Paul Sherman and Chief Armstrong, Appellant "basically admitted to being the person responsible for shooting and killing Ms. Cherry." Appellant stated that the victim asked for change; he told her he did not have any change. The victim cursed Appellant, calling him a "punk-ass bitch" and he shot her. The victim "took off running," and Appellant "hunted that bitch down and continued to shoot her." Appellant explained to police that he "felt empowered when he put a gun in his hand, that when he pulled the trigger and killed somebody, he got what he described as a rush." After the interview, a recorded formal interview was conducted. During the recording, Chief Armstrong described Appellant as "guarded" and "careful" with his word choices. Appellant told authorities that the murder weapon was located on Haywood Street near his house.

Police searched for the murder weapon, a .40 caliber Sigma semi-automatic handgun. It was found in the backyard of a residence on Haywood buried under some leaves beneath a toy four-wheeler that was covered with a blue tarp. A revolver was also found on the tire of a car parked under the carport. Ballistics evidence revealed that nine of the twenty-four bullet fragments, bullets, cores, and cases recovered from the scene of the Cherry murder had been fired through the .40 caliber weapon.

The jury convicted Appellant of first degree premeditated murder. The trial court imposed a sentence of life in prison without the possibility of parole. The trial court ordered the sentence to be served consecutively to sentences in case numbers 08-06538 and 09-01393. After the denial of a motion for new trial, Appellant appeals.

*Analysis*

On appeal, Appellant argues that the trial court erred in denying the motion to suppress because the statement was "the result of an illegal arrest" and the statement "was not voluntar[ily] made as it was the product of promises of leniency and threats of death."

This Court has already determined in *Dexter Cox I* that there was probable cause to arrest Appellant. This Court stated:

We must first determine the nature of the interaction between [A]ppellant and law enforcement. Officer Merritt testified that at the time [A]ppellant was booked into jail, he was not being charged with anything but was being detained on "48-hour hold for aggravated burglary and theft of property." The Memphis Police Department's policy of detaining suspects pursuant to a "48-hour" hold has been criticized by this court. *See State v. Courtney Bishop*, No. W2010-01207-CCA-R3-CD, 2012 WL 938969, at *7 (Tenn. Crim. App.[, at Jackson,] March 14, 2012) ("This court has repeatedly noted the illegality of the procedure and warned the Memphis Police Department specifically against its use."), *perm. app. granted*, No. W2010-01207-SC-R11-CD (Tenn. Aug. 12, 2012). As in *Courtney Bishop*, the record in this case "establishes that, despite the officer's insistence that the defendant was merely to be held for 48 hours, the seizure in this case was a full-scale arrest." *Id.* Accordingly, it follows that [A]ppellant's warrantless arrest must have been supported by probable cause.

Appellant was detained or arrested on the charges of theft of Lieutenant Vidulich's handguns and aggravated burglary of his home. Tennessee law recognizes that "the possession of recently stolen goods, if not satisfactorily explained, gives rise to the inference that the possessor has stolen them, *Bush v. State*, 541 S.W.2d 391 (Tenn. 1976); *State v. Land*, 681 S.W.2d 589, 591 (Tenn. Crim. App. 1984), and has committed the burglary antecedent to the theft. *State v. Hamilton*, 628 S.W.2d 742, 746 (Tenn. Crim. App. 1981) (citations omitted)." *State v. Andrew William Byers and Larry Wayne Key*, No. 01C01-9601-CC-00002, 1997 WL 488621, at *5 (Tenn. Crim. App.[, at Nashville,] Aug. 22, 1997). Moreover, [A]ppellant changed his testimony about how he came into possession of the gun, and officers discovered that [A]ppellant was actually the informant "Tony Smith" who had been at Lieutenant Vidulich's house and claimed to have information about the theft and burglary. In addition, Mr. Cunningham testified that [A]ppellant tried to sell the stolen property to him. Thus, officers clearly had probable cause to arrest [A]ppellant for theft of property and aggravated burglary before he confessed to the murder of Herbert Wooten [and Gwendolyn Cherry]. The trial court properly declined to exclude [A]ppellant's subsequent confession to the murder of the victim on the basis of an allegedly illegal arrest.

*Dexter Cox I*, 2013 WL 118714, at *10-11.

Because there was probable cause to arrest Appellant, we must next determine if the statements he made to police were voluntary. Appellant raised this identical issue in *Dexter*

-12-

*Cox I*. Again in this appeal, Appellant insists that his statements were procured through promises of leniency and threats of death. In this appeal, as in *Dexter Cox I*, Appellant does not contest that the waiver of his Miranda rights was made freely, voluntarily, and intelligently. *See Dexter Cox I*, 2013 WL 118714, at *12. Instead, Appellant claims that coercion by promises of leniency and threats of death prompted his statements.

As noted in *Dexter Cox I*, at the hearing on the motion to suppress, the testimony showed that Appellant made a total of five statements to police over the course of three days. During this time period, he executed two advice of rights forms. Additionally, three of Appellant's statements actually contained a waiver of rights. Appellant was described as cooperative during the process and did not at any time indicate that he wished to speak with an attorney or invoke his right to remain silent. The police officers and investigators that testified at the hearing on the motion to suppress denied that any threats or promises were made to Appellant throughout the process. In fact, the only testimony to support Appellant's assertion that he was threatened or promised anything was his own self-serving testimony and a short comment at the end of his confession to killing Vidulich wherein he claimed he only confessed because the police threatened to lock up his family. The trial court accredited the testimony of the officers and specifically commented that Appellant "appeared less than credible." Further, there was testimony that Appellant's family members came in voluntarily for interviews during the investigation and were never handcuffed. From the record before us, we cannot conclude that Appellant's statement was compelled by promises of leniency.

Moreover, there is no proof, save Appellant's own testimony, that he was threatened with death by the police. Again, the trial court assessed the credibility of the witnesses and concluded that Appellant's claims were unsupported. The record supports the trial court's findings of fact and the legal conclusions with regard to this issue. *See State v. Morgan*, 825 S.W.2d 113, 116 (Tenn. Crim. App. 1991) (affirming conviction where the appellant claimed that police alluded to the death penalty if he did not talk, but if he gave a confession, police assured him they would talk to the prosecutor about charging him with manslaughter).

In *Dexter Cox I*, this Court felt compelled to note even if that admission of Appellant's statement was error, it was harmless beyond a reasonable doubt. 2013 WL 118714, at *13. Because we have determined that there was both probable cause for the arrest of Appellantand that Appellant knowingly, intelligently, and voluntarily waived his *Miranda* rights, the resulting admission of his statements was not erroneous and we need not address whether the trial court committed error under the harmlessness standard for non-structural constitutional errors. Appellant is not entitled to relief.

-13-

*Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.


_____
JERRY L. SMITH, JUDGE